UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDS SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____             │
│ DATE FILED: 9/26/2014            │
└─────────────────────────────────┘
```

JAMES MICHAEL HARLEY,

                          Plaintiff,

          -v-                                    No. 13-cv-954 (RJS)
                                                 OPINION AND ORDER

MINERALS TECHNOLOGIES INC.,

                          Defendant.

RICHARD J. SULLIVAN, District Judge:

          Plaintiff James Michael Harley ("Harley") brings this action alleging that his former

employer, Defendant Minerals Technologies, Inc. ("MTI"), failed to make the severance

payments to which he is entitled.  Specifically, Harley asserts causes of action for (1) breach of

his employment contract with MTI; (2) a violation of the Pennsylvania Wage Payment and

Collection Law (the "PAWPCL"); and (3) quantum meruit.  Now before the Court is MTI's

motion for summary judgment.  For the reasons that follow, MTI's motion is granted.

I. BACKGROUND

A. Facts

          Harley began working for MTI as its Treasurer and Vice President for Corporate

Development in November 2010.[1]  (Def. 56.1 Stmt. ¶ 3.)  In that capacity, Harley earned an

---

[1] The facts are drawn from MTI's Local Rule 56.1 Statement of Undisputed Material Facts (Doc. No. 49 ("Def. 56.1 Stmt.")), Harley's Response to Defendant's Statement of Undisputed Facts (Doc. No. 58 ("Pl. 56.1 Stmt.")), the separately numbered paragraphs of Harley's Counterstatement of Material Facts (Doc. No. 58 ("Pl. 56.1 Counter.")), and MTI's Response to Plaintiff's Counterstatement of Material Facts (Doc. No. 59 ("Def. 56.1 Resp.")).  Unless otherwise noted, where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.  In deciding this motion, the Court has also considered MTI's memorandum of law in support of its motion (Doc. No. 48 ("Mem.")), Harley's opposition to MTI's motion (Doc. No. 54 ("Opp'n")), and MTI's reply (Doc. No. 60 ("Reply")), along with the affidavits, declarations, and exhibits submitted in support of the foregoing (Doc. Nos. 50–

annual salary of $280,000 and was entitled to "severance amounting to 15 months' pay in the event that MTI chose to terminate his employment." (*Id.* ¶ 5.) Harley worked from MTI's New York headquarters (*id.* ¶ 8), and he was supervised by Joseph Muscari ("Muscari") and Doug Dietrich, both of whom also worked from MTI's New York headquarters (*id.* ¶¶ 9–11). Harley's employment contract contained a New York choice-of-law provision. (*See* Declaration of Holly Rich, dated Nov. 20, 2013, Doc. No. 50 ("Rich Decl."), Ex. C ¶ 12 ("November 2010 Contract").) Harley was eventually relieved of his Treasurer duties (Def. 56.1 Stmt. ¶ 18), and, in July 2011, Harley's employment status was again adjusted when Muscari informed Harley of the decision to replace Harley as Vice President for Corporate Development with Jonathan Hastings ("Hastings"), who would "decide whether there would be a place for Mr. Harley in corporate development going forward" (*id.* ¶ 24).

In early September 2011, following that demotion, Harley signed a new employment contract in MTI's New York office. (*Id.* ¶¶ 24–28.) This new contract reduced Harley's annual salary to $230,000 and limited his severance package to four months' salary. (*Id.* ¶ 27 (citing Affirmation of James Harley, dated Dec. 20, 2013, Doc. No. 57 ("Harley Aff."), Ex. 1 ("September 2011 Contract") ("In the event your employment with MTI should end, you will receive a severance payment equal to four months of salary within 90 days of [the] termination date.")).)[2] Thereafter, Harley was transferred to the MTI office in Bethlehem, Pennsylvania but was placed under the supervision of Hastings, who was based in New York. (Def. 56.1 Stmt. ¶ 29–31.)

---

51, 56–57). The background facts underlying this case were also thoroughly discussed in the Court's July 10, 2013 Memorandum and Order denying Defendant's motion to transfer this action to the Eastern District of Pennsylvania. (Doc. No. 27 ("July 10 Order").)

[2] Unlike Harley's earlier contract, which contained a New York choice-of-law provision (*see* November 2010 Contract ¶ 12), the September 2011 Contract contained no such provision (*see generally* September 2011 Contract).

In late March 2012, Harley attended a meeting with Hastings, his immediate supervisor, in Hastings's New York office. (*Id.* ¶ 34.) At this meeting (the "March meeting"), Hastings notified Harley of his decision to terminate Harley's employment. (*Id.*) Following a discussion of future options and severance payments, Hastings sent Harley an email on April 3, 2012, which memorialized the March meeting and confirmed that Harley would be permitted to retain his employee status through the four-month severance period while spending time on both transitioning out of MTI and searching for new employment. (*Id.* ¶ 38; *see also* Rich Decl. Ex. I at 2.) Harley ultimately returned to the MTI office in Bethlehem as his base of operations and continued to conduct activity on behalf of MTI through late July 2012. (*See, e.g., id.* ¶¶ 42–46, 54; Pl. 56.1 Stmt. ¶¶ 42–46, 54.) Harley also searched for a new job throughout this period. (Def. 56.1 Stmt. ¶¶ 49–50; Pl. 56.1 Stmt. ¶¶ 49–50.)

### B. Procedural History

Harley filed a complaint in this matter on February 11, 2013, alleging that MTI's refusal to pay Harley four months' severance pay following his termination on July 31, 2012 constituted a breach of the September 2011 Contract and a violation of the PAWPCL. (Doc. No. 1.) On April 24, 2013, MTI filed its motion to transfer venue to the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1404(a) (Doc. No. 16), which the Court denied on July 10, 2013 (*see* July 10 Order). On June 21, 2013, the Court granted Harley leave to file an Amended Complaint (Doc. No. 23), which Harley then filed on June 26, 2013, adding a quantum meruit claim in the alternative (Doc. No. 24). Following the close of discovery, MTI filed the instant motion for summary judgment on November 20, 2013 (Doc. No. 47), and the motion was fully submitted on January 6, 2014 (Doc. Nos. 59–60).

3

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [non-moving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed

4

facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### III. Discussion

### A.  Choice of Law

Before addressing the merits of Harley's claims, the Court must first resolve what law is applicable to each claim.  MTI argues that the Court should apply New York law (Mem. at 4–6), while Harley contends that Pennsylvania law should govern (Opp'n at 11–14).  A federal court sitting in diversity applies the choice-of-law principles of the state in which it sits.  *See Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 871 (2d Cir. 1994).  In New York, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws."  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  An "actual conflict" exists where "the applicable law from each jurisdiction provides different substantive rules" and those differences are "relevant to the issue at hand[] and . . . have a significant *possible* effect on the outcome of the trial."  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331–32 (2d Cir. 2005) (emphasis in original) (internal quotation marks and citations omitted).  Where there is no actual conflict, a choice-of-law analysis is unnecessary and New York law will apply.  *See Curley*, 153 F.3d at 12.  However, if the court finds an actual conflict between the applicable law of each jurisdiction, then, in the absence of an express choice-of-law provision, the "center of gravity" or "grouping of contacts" analysis is to be applied.[3]  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573,

---

[3] Hereinafter, the Court will refer to this analysis as the "center of gravity test."

583 (2d Cir. 2006); *Tri-State Emp't Servs., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 260–61 (2d Cir. 2002).  Under the center of gravity test, a court may consider a spectrum of significant contacts, including:  "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Tri-State*, 295 F.3d at 261.  After weighing those factors, a court will ultimately apply the law of the state with the most significant contacts with the contract.  *See id.* at 260–61.

1. Breach of Contract Claim

With respect to Harley's breach of contract claim, the Court finds that there is no actual conflict of law.  Both New York and Pennsylvania law recognize that where an employment relationship is "at-will," an employer is free to unilaterally change the terms of employment. *Compare Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 432 (S.D.N.Y. 2013) ("Under New York law, an employer is free to change the terms of at-will employment . . . prospectively, subject to the employee's right to leave such employment if the new terms are unacceptable."), *and Bottini v. Lewis & Judge Co.*, 621 N.Y.S.2d 753, 754 (App. Div. 3d Dep't 1995) ("[Employer] was free to modify the terms of plaintiff's employment, subject only to plaintiff's right to leave his employment if he found the new terms unacceptable."), *with Divenuta v. Bilcare, Inc.*, No. 09-cv-3657 (WHY), 2011 WL 1196703, at *3 (E.D. Pa. Mar. 30, 2011) ("[Under Pennsylvania law, the] power to terminate the employment relationship 'at-will' carries with it the power to dictate prospective changes in the terms of employment, including an employee's compensation."), *and Green v. Bettinger Co.*, 608 F. Supp. 35, 42 (E.D. Pa. 1984) ("[Under Pennsylvania law, t]he undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment.").  Similarly, both New York and Pennsylvania courts construe an

6

employee's decision to remain employed after the employer's unilateral modification of the employment terms as assent to the new terms. *Compare Dreyfuss v. eTelecare Global Solutions-US, Inc.*, No. 08-cv-1115 (RJS), 2010 WL 4058143, at \*4 (S.D.N.Y. Sept. 30, 2010) ("[Under New York law,] when an employer alters the terms of an employment agreement prospectively, the employee has the choice between leaving his job or staying and being deemed to have agreed to the new arrangement." (citation and internal quotation marks omitted)), *and Bottini*, 621 N.Y.S.2d at 754 ("Having remained in defendant's employment, however, plaintiff is deemed to have assented to the modification and, in effect, commenced employment under a new contract."), *with Green*, 608 F. Supp. at 40 ("[I]f an employee is dissatisfied with the [unilaterally modified] terms offered by the employer, the employee is free to resign."). Thus, because there is no actual conflict here between New York and Pennsylvania law, the forum law – New York – will apply.

### 2. Quantum Meruit Claim

The Court next turns to Harley's quantum meruit claim. Because a claim in quantum meruit is treated as a claim in quasi-contract under New York law, *see Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000), such claims are subject to New York's choice-of-law analysis for contract claims, *see Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001). Here, there is no actual conflict between the law governing quantum meruit claims in New York and that in Pennsylvania. Under both New York and Pennsylvania law, quantum meruit claims are precluded by the existence of a valid employment agreement. *Compare Dreyfuss*, 2010 WL 4058143, at \*10 ("[Q]uasi-contract claims[, including those in quantum meruit,] are precluded by the existence of valid employment agreements."), *with Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) ("Under Pennsylvania

7

law, . . . [w]here an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract; and where the contract fixes the value of the services involved, there can be no recovery under a quantum meruit theory." (citation and internal quotation marks omitted)), *and Keystone Dedicated Logistics v. Flexaust Co.*, 709 F. Supp. 2d 389, 396 (W.D. Pa. 2010) ("[T]he doctrines of unjust enrichment and *quantum meruit* are, under Pennsylvania law, inapplicable with regard to matters governed by enforceable contract provisions."). Thus, because there is no actual conflict between New York and Pennsylvania law, New York law will apply. *See Curley*, 153 F.3d at 12.

### 3. PAWPCL Claim

Finally, the Court turns to Harley's PAWPCL claim and the question of whether the New York and Pennsylvania wage payment statutes are in conflict and, if so, which state's statute applies. Because the statutory wage payment claim here arises out of the contractual employment relationship between Harley and MTI, a New York court would utilize the contracts conflict-of-law analysis. *See, e.g., Smith v. Railworks Corp.*, No. 10-cv-3980 (JPO), 2012 WL 752048, at *15 (S.D.N.Y. Mar. 6, 2012) ("Since the statutory claim here arises out of an employment contract, New York law would view the claim as sounding in contract."). Here, Harley concedes that the New York and Pennsylvania wage payment statutes are in actual conflict (*see* Opp'n at 10 ("With respect to wage payment statutes, there is a conflict between Pennsylvania and New York.")), and the Court agrees. Pennsylvania allows for the recovery of severance pay as earned wages under the PAWPCL. *See* 43 Pa. Cons. Stat. § 260.2a (defining "Wages" to include "fringe benefits or wage supplements," which are further defined to include "separation, vacation, holiday, or guaranteed pay"); *see also Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571, 578 (Pa. Super. Ct. 1999) (finding that plaintiff employee could state

a valid claim under the PAWCPL based on employer's refusal to make promised severance payments). New York's equivalent statute, on the other hand, specifically excludes severance pay recovery for "any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week." N.Y. Lab. Law §§ 192(2), 198-c(3). There is no dispute that Harley was employed in an "executive capacity," and Harley's annual base salary under the September 2011 Contract was $230,000 (September 2011 Contract at MTI000572),[4] which far exceeds New York's exclusion for "executive, administrative, or professional" employees earning more than $900 per week, N.Y. Lab. Law §§ 192(2), 198-c(3).

Having found the presence of an actual conflict between the relevant law of New York and Pennsylvania with respect to Harley's statutory wage payment claim, the Court now turns to the center of gravity test. In denying Defendant's motion to transfer venue to the Eastern District of Pennsylvania, the Court previously undertook a similar analysis. (*See* July 10 Order.) Although the change-of-venue analysis includes a center of gravity test, *see, e.g.*, *Amick v. Am. Express Travel Related Servs. Co.*, No. 09-cv-9780 (AKH), 2010 WL 307579, at *2 (S.D.N.Y. Jan. 26, 2010) (using the center of gravity test as one factor among many in change-of-venue analysis), the choice-of-law analysis is more focused and differs from the change-of-venue analysis in which the "plaintiff's choice of forum [is accorded] considerable deference," *Ackerley Media Grp., Inc. v. Sharp Elecs. Corp.*, 170 F. Supp. 2d 445, 451 (S.D.N.Y. 2001) (citation and internal quotation marks omitted) ("[It is a mistake to] conflate[] choice of law and choice of forum analyses."). Nonetheless, as part of the Court's examination of the "locus of operative facts" pursuant to the change-of-venue analysis in the July 10 Order, the Court found that:

---

[4] Harley's $230,000 annual salary divided over fifty-two weeks yields a weekly salary of $4,423.08.

9

> The [September 2011 Contract] was negotiated and signed in MTI's Manhattan
> office. (Harley Decl. ¶¶ 14-17, 20.) Performance of the contract occurred
> primarily in Pennsylvania, where Plaintiff's office was located during the time
> between the execution of the contract and July 31, 2012 (Mem. at 6); however,
> Plaintiff does note that he was assigned to numerous projects that required him to
> travel outside of Pennsylvania and that he made regular trips to New York for
> meetings during that time (Harley Decl. ¶ 25, 27). Therefore, key events occurred
> in both New York and Pennsylvania, but the comparative importance of each is
> not yet clear.

(July 10 Order at 7.) The record having been more fully developed, the Court finds that the

discussion that occurred in approximately March 2012 regarding the disputed modification of the

September 2011 Contract took place at MTI's New York Office.[5] (*See* Def. 56.1 Stmt. ¶¶ 34–

35; Pl. 56.1 Stmt. ¶¶ 34–35.) Thus, New York was the principal (1) place of contracting, and (2)

place of negotiation, both of which are key considerations in the center of gravity test. *See Tri-*

*State,* 295 F.3d at 261.

 The Court also finds that after execution of the September 2011 Contract, Harley came

under the supervision of New York-based supervisor Hastings. (*See* Def. 56.1 Stmt. ¶¶ 29–30;

Pl. 56.1 Stmt. ¶¶ 29–30.) In addition, Harley "made regular trips to New York for meetings"

while employed pursuant to the September 2011 Contract, making New York a place of partial

performance (Def. 56.1 Stmt. ¶ 31; Pl. 56.1 Stmt. ¶ 31), which is yet another factor relevant to

the center of gravity test, *see Tri-State,* 295 F.3d at 261. Further, MTI is domiciled in New York.

(*See* Def. 56.1 Stmt. ¶ 2; Opp'n at 13.) To be sure, MTI does operate part of its business in

Pennsylvania (*see* Pl. 56.1 Stmt. ¶ 2), and a significant portion of Harley's performance under

the September 2011 Contract also took place in both Pennsylvania and abroad (*see* Pl. 56.1 Stmt.

¶¶ 4, 16, 31; Declaration of James Michael Harley, dated Dec. 20, 2013, Doc. No. 57 ("Harley

---

[5] Harley claims that some portion of the lengthy renegotiation process took place via phone and email from Pennsylvania and Illinois. (Pl. 56.1 Stmt. ¶ 28.) However, Harley does not dispute that negotiations also took place in New York and concedes that the September 2011 Contract "was signed and delivered in New York." (*Id.*)

Decl."), ¶ 31 ("After I signed the [September 2011 Contract], I moved to Bethlehem, Pennsylvania, my primary office was at MTI's offices there, most of my work for MTI while there was performed in Bethlehem, Pennsylvania . . . ."); *id.* ("I traveled extensively for work to Brazil, Pittsburgh, and elsewhere, once my office was relocated to Bethlehem.")). Nevertheless, these latter two factors – MTI's business activity and Harley's partial performance in Pennsylvania – alone are not substantial enough to outweigh the significant New York contacts otherwise present here. Nor does Harley's Illinois domicile tilt the balance in favor of Pennsylvania.[6]

Having carefully considered the spectrum of contacts recognized under the center of gravity of test, the Court finds that New York has the most significant contacts with the contract with respect to "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Tri-State,* 295 F.3d at 261. Consequently, the Court concludes that New York law applies to Harley's statutory wage payment claim. Accordingly, Harley cannot pursue his PAWCPL claim in this action, and the Court grants MTI's motion for summary judgment as to that claim. The Court now turns to the merits of Harley's remaining breach of contract and quantum meruit claims.

### B. Merits

#### 1. Breach of Contract Claim

The gravamen of Harley's breach of contract claim is that MTI breached the September 2011 Contract by refusing to pay him four months' severance pay following his termination on July 31, 2012. (*See* Opp'n at 1.) Under New York law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the party seeking recovery; (3)

---

[6] Although not included in his Local Civil Rule 56.1 Statement, Harley claims that he was domiciled in Illinois but lived in Pennsylvania beginning in or around January 2012. (*See* Opp'n at 13–14.)

non-performance by the other party; and (4) damages attributable to the breach. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000). As noted above in the Court's "actual conflict" analysis, where an employment relationship is at-will, the employer is free to unilaterally change the terms of employment, and an employee's decision to remain employed following such a modification is generally construed as assent to the modified terms. *See, e.g., Klein*, 979 F. Supp. 2d at 432; *Dreyfuss*, 2010 WL 4058143, at *4. New York law recognizes that "[a]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Rooney v. Tyson*, 674 N.Y.S.2d 616, 618 (N.Y. 1998).

Turning first to the nature of Harley's employment, the Court finds that Harley was an at-will employee under the September 2011 Contract, which plainly states that Harley's employment will not last for any fixed duration after 2011. (*See* September 2011 Contract at MTI000571 ("As discussed, it is the intention of MTI for you to continue in your current position through the remainder of 2011. Your continued role after 2011 will be evaluated as necessary and appropriate.").) Harley's own deposition testimony effectively concedes as much. (*See* Rich Decl. Ex. B, Dep. of James Harley, Aug. 1, 2013, ("Harley Dep."), at 130:24–131:7 ("[Hastings] could have told you to leave any day of the week; correct? A[:] That's correct, he could have fired me any day of the week but he didn't. Q[:] And you could have left any day of the week; correct? A[:] Sure."); *id.* at 94:10–18.) Moreover, Harley neither challenges MTI's characterization of his employment as having been at-will (*see generally* Opp'n), nor points to any factual dispute surrounding the at-will nature of his employment under the September 2011 Contract (*see generally* Pl. 56.1 Stmt.). Thus, the Court finds that Harley was an at-will employee pursuant to the September 2011 Contract.

Having found that Harley's employment under the September 2011 Contract was at-will, the Court must next address whether the September 2011 Contract was modified in order to determine Harley's entitlement, if any, to additional severance payments.   While Harley contends that he was entitled to severance payments following his termination on July 31, 2012 (*see* Opp'n at 1), MTI argues that MTI unilaterally modified, with Harley's assent, the September 2011 Contract such that the severance payments commenced in April and terminated on July 31, 2012 (*see* Mem. at 6–15; Reply at 4–5).   According to MTI, Hastings informed Harley of his termination at the March meeting[7] and presented him with three options related to the severance period:  (1) "The first option would be for Mr. Harley to essentially receive his four months' severance payment as previously agreed to in the September 2011 [C]ontract and walk out the door of MTI that day;" (2) "The second option would be for Mr. Harley to retain his 'employee status' through the duration of the four month severance period but allow Mr. Harley to spend all of his time focused on his job search;" and (3) "The third option would be for Mr. Harley to retain his 'employee status' through the duration of the four month severance period but instead of spending all of his time on his job search, this option allowed Mr. Harley flexibility to transition his work projects and to protect his reputation."  (Def. 56.1 Stmt. ¶ 35; *see also* Mem. at 9.)  Harley then "chose option three" (Def. 56.1 Stmt. ¶ 36), which MTI considered "to be a favor to Mr. Harley, as a way to help a former highly compensated executive land on his feet with regard to his next career move" (*id.* ¶ 37).  Hastings then memorialized the conversation (and Harley's selection of option three) in an email on April 3, 2012 (*id.* ¶ 38; Rich Decl. Ex. I at 2 ("You selected and we agreed upon option 3.")), to which Harley never responded (Def. 56.1 Stmt. ¶ 39).  As described in the April 3, 2012 email, Harley was to "retain

---

[7] Harley contends that this conversation occurred on March 28, 2012.  (Pl. 56.1 Stmt. ¶ 35.)

employee status through [the] duration of [the four-month] severance period, [and] time spent will be as needed to transition and balanced to allow time for [Harley's] job search." (Rich Decl. Ex. I at 2.)

Harley's account of these events differs. Harley characterizes the three options presented by Hastings as follows: (1) "Harley would simply receive his severance and be made a 'contract employee;'" (2) "Harley's employment would be extended until July 31, 2012 with the caveat that his workload would be lowered until he got another job;" and (3) "Harley would stay an employee but spend the majority of his time finding a job and his work would be reduced to 'zero percent.'" (Pl. 56.1 Stmt. ¶ 35.) Moreover, Harley claims that he "did not 'choose' any of the options and no agreement was reached in the conversation." (*Id.* ¶ 36; *see also* Harley Dep. at 77:10–16 ("I believe my answer to Mr. Hastings was . . . I wanted to work at MTI as long as possible. So let's go with the option that gives – or go with the options or pathways that allow me to work at MTI as long as possible.").) As for Hastings's April 3, 2012 email, Harley acknowledges that he received it and that he never responded to it. (Pl. 56.1 Stmt. ¶ 39.) Nevertheless, he now contends that he did not respond to this email because he "was waiting for an agreement that we would negotiate, write, and sign." (Harley Dep. at 123:3–4;[8] *see also* Pl. 56.1 Stmt. ¶ 36 ("Harley reasonably believed, based on past practice and the importance of these issues, that no agreement had been reached in the conversation and that any agreement would be put in writing and signed by the parties."); *id.* ¶ 39 ("Harley's failure to respond to the email was not a function of his agreement to the email, but rather a function of Harley's expectation that a formal agreement would be negotiated and drafted, based on past practice . . . .).)

_____

[8] This portion of Harley's deposition testimony was not included in the excerpt of his testimony attached to the Declaration of Holly Rich (*see* Rich Decl. Ex. B), but it was included in the excerpt of his testimony attached as an exhibit to the Affirmation of Paul Rooney (*see* Affirmation of Paul P. Rooney, dated Dec. 20, 2013, Doc. No. 56 ("Rooney Aff."), Ex. 3).

As a predicate to resolving Harley's breach of contract claim, the Court must first make a determination regarding what terms governed the employment relationship. As noted above, an employee's decision to remain employed following a modification to the terms of his at-will employment is generally construed as assenting to the modified terms. *See, e.g.*, *Klein*, 979 F. Supp. 2d at 432; *Dreyfuss*, 2010 WL 4058143, at *4. Here, following the March meeting with Hastings, Harley was permitted to choose between three options regarding the nature of his ongoing employment with MTI. (*See* Def. 56.1 Stmt. ¶ 35; Pl. 56.1 Stmt. ¶ 35.) Under Harley's version of events, the parties never *expressly* reached an agreement concerning which of those three options would govern the terms of Harley's employment going forward. (Pl. 56.1 Stmt. ¶ 36.) But such an express accord is not required under New York law, which leaves employers "free to change the terms of at-will employment prospectively, subject to the employee's right to leave such employment if the new terms are unacceptable." *Klein*, 797 F. Supp. 2d at 432 (citation omitted). Hastings's April 3, 2012 email to Harley, which memorialized the March meeting, unequivocally set forth the new terms of Harley's employment. (Rich Decl. Ex. I at 2 ("You selected and we agreed upon option 3."); *see also id.* at 5 (describing "4 month severance period that started beginning of April and ends end of July"); *id.* at 6 ("[T]he last severance payments from MTI will cover through the end of July. That will conclude the 4 mo[nth] severance period . . . .").) At that point, Harley could have either (1) left MTI and demanded his severance payments in accordance with the September 2011 Contract, or (2) continued his employment subject to the new terms. Harley chose the latter course and remained at MTI, which provided him with the resources and flexibility designed to facilitate his pursuit of new employment opportunities. Silence, or simply ignoring the April 3 email in the hope that another better offer might emerge, were not options available to Harley. Nor was MTI required to send

him "an agreement that [the parties] would negotiate, write, and sign." (Harley Dep. at 123:3–4); *see Dreyfuss*, 2010 WL 4058143, at *4.

Accordingly, the Court finds that Harley's decision to remain at MTI following the March meeting and April 3, 2012 email constituted assent to the new terms of his employment – as set forth in the April email – which provided for severance payments over a four-month period ending on July 31, 2012. There is no dispute that MTI made payments to Harley through the end of that period, in conformity with the terms of the April 3, 2012 email. Accordingly, the Court finds that there was no breach of the modified contract, and grants MTI's motion for summary judgment as to Plaintiff's breach of contract claim.

### 2. Claim in Quantum Meruit

As noted above, quantum meruit claims are precluded by the existence of a valid employment agreement under New York law. *See, e.g.*, *Dreyfuss*, 2010 WL 4058143, at *10. Because the Court finds that Harley's decision to remain at MTI following the March meeting constituted assent to the new terms of employment, the Court grants MTI's summary judgment motion as to Harley's claim in quantum meruit.

### III. CONCLUSION

For the reasons stated above, MTI's motion for summary judgment is granted. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 47, enter judgment in favor of MTI, and close this case.

SO ORDERED.

Dated:     September 26, 2014
          New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

16